## *In re* RICE, Petitioner.

ORIGINAL.

No number. Submitted December 3, 1894. — Decided December 17, 1894.

A party is entitled to a writ of prohibition as a matter of right where it appears that the court whose action is sought to be prohibited had clearly no jurisdiction of the cause originally, or of some collateral matter arising therein, and that he objected to the jurisdiction at the outset, and has no other remedy.

But where there is another remedy, by appeal or otherwise, or where the question of the jurisdiction of the court is doubtful or depends on facts which are not made matter of record, or where the application is made by a stranger, the granting or refusal of the writ is discretionary; and it is not obligatory where the case has gone to sentence, and the want of jurisdiction does not appear on the face of the proceedings.

A writ of mandamus cannot be issued to compel the court below to decide a matter before it in a particular way, or to review its judical action had in the exercise of legitimate jurisdiction.

A writ of mandamus cannot be used to perform the office of an appeal or writ of error, even if no appeal or writ of error is given by law.

The fact that, in the administration of the assets of an insolvent corporation in the custody of receivers, summary proceedings are resorted to, does

not, in itself, affect the jurisdiction of the Circuit Court, as having proceeded in excess of its powers, and, where notice has been given and hearing had, the result cannot properly be interfered with by mandamus.

RECEIVERS of the Philadelphia and Reading Railroad and Philadelphia and Reading Coal and Iron Companies were appointed February 20, 1893, by the Circuit Court for the Eastern District of Pennsylvania, upon a bill for foreclosure filed by a holder of third preference income bonds of those companies.

Leave was subsequently granted the receivers to issue certificates for the purpose of paying wages and other preferred claims. The receivers and the railroad company filed a petition September 25, 1894, for authority to enter into an agreement for the partial readjustment of the affairs of the Philadelphia and Reading Railroad and Coal and Iron Companies, and to make the payments therein provided, if the plan were carried into effect. The Circuit Court ordered that the petition should be heard on October 15, 1894, at ten o'clock A.M., and that notice of the hearing should be given by advertisement in newspapers published in New York, Philadelphia, and in the London Times. At the time appointed the hearing was begun, but could not be completed by reason of the pressure of trial business, and the court suggested that, to avoid delay and in relief of counsel, some of whom were not residents of Philadelphia, the petition might be referred to a special master, and that the arguments in the master's office might be stenographically reported, and would be considered on the coming in of the master's report as if they had been made in court. This suggestion was accepted, and thereupon the order of reference was made, and the master subsequently filed his report, including the arguments as taken down at length. Application was made for a further hearing which was denied, the report of the master confirmed, and the order prayed for in the petition entered.

The report of the master stated that the companies " have outstanding prior general mortgage bonds, amounting to $44,491,188.77, bearing four per cent interest, maturing semiannually, January and July 1st, which for the past eighteen months is in arrear and unpaid. The receivers, under an order

made July 6th, 1893, authorizing them to issue receivers' certificates, have issued them to the amount of $3,640,000. The Philadelphia and Reading Railroad Company also owe other general, well-secured indebtedness to the amount of $3,843,000, and further indebtedness, with interest, aggregating $7,533,000, for necessary equipment, for which a large part of the value thereof has been paid, leaving a valuable equity of the company therein over the said debt therefor. The receivers, upon the payment of the said secured general indebtedness, will have $10,000,000 of 5 per cent collateral trust gold bonds of the Philadelphia and Reading Railroad Company, secured by stocks and bonds of its associated companies, which are a valuable and necessary part of its system, to dispose of for payment of the said classes of indebtedness, which, by reason of priority of liens, or value of securities pledged therefor, are entitled to a preference in the disposition of the proceeds of the said collateral trust bonds, over other indebtedness of the company. Some of the said general mortgage bondholders have combined to enforce foreclosure of their mortgage, under due legal proceedings."

The report then set forth the proposed plan of readjustment which, in brief, provided for the purchase of the overdue and maturing coupons of the general mortgage bonds of the Philadelphia and Reading Railroad Company and an extension of the time of payment for ten years from the date of each purchase, and for the sale of ten million five per cent collateral trust bonds to the stockholders and junior bondholders of the company at par. Such stockholders and bondholders as were unable or unwilling to purchase the bonds at par were given the privilege of making a cash contribution, by way of a gift, of three million dollars, and in that event a syndicate had been formed to take and pay for the bonds the sum of seven million dollars. In case the plan should become effective, and only upon that condition, the receivers were to pay the purchasers of the coupons, who were to extend them for ten years, a commission of two and one-half per cent, and to the purchasers of the collateral trust bonds a like commission of two and one-half per cent. If the plan

were carried into effect, the company would obtain an extension upon its general mortgage bonds of ten years, and sell ten million of its collateral trust bonds at par, for whether the stockholders and junior security holders purchased and paid for the bonds themselves at par, or the syndicate should take them at seventy per cent and the stockholders and junior bondholders paid the remaining thirty per cent as a cash donation, the result would be the same.

The plan also provided for the creation of a voting trust whereby the right of the stockholders to elect six managers and the president under the charter of the company was distributed among the general mortgage bondholders, the income bondholders, and the stockholders, under a system of registration of the bonds.

The readjustment agreement was to be taken in connection with a previous agreement between the general mortgage bondholders in respect of foreclosure, and it is averred that since the order complained of was entered, sufficient of the general mortgage bonds have been deposited to enable foreclosure to go forward if the readjustment plan should fail, and reorganization to be reached in that way.

The master said: " In any event, whether of success of the scheme, or of foreclosure, because of the priority of the lien of the coupons and interest of the general mortgage bonds, and the receivers' certificates and the salvage of the securities pledged for the secured indebtedness and of the equipment, the debts which are proposed to be paid out of the said moneys to be raised, would be payable out of the proceeds of the collateral trust bonds and their security, in preference to the income mortgage bondholders, unsecured general indebtedness and stockholders. The coupons of the general mortgage bonds carry 6 per cent interest from their maturity. Too small a part of those bonds are registered to warrant a discrimination against the small amount of interest thereon, which will not carry interest from maturity. The counsel for the receivers state that the equipment and the other well-secured obligations proposed to be paid also carry 6 per cent interest. The collateral trust bonds proposed to

be sold carry 5 per cent interest. No substantial offer of better prices for the assets proposed to be sold in this plan was made, much less in the mode required by courts from parties opposing the consummation of judicial sales, in security for a substantial better price."

The master found that the commissions provided for were not unreasonable ; that it was not probable that, under a fore-closure, the collateral trust bonds or their security would produce more ; that it was the duty of the receivers to pay or provide for the interest upon the general mortgage bonds to avoid foreclosure ; that an investigation of the causes of the fact that the receivers had not the means to pay the present default upon the general mortgage interest, or the other pressing indebtedness, would not aid in the consideration of the present duty of the court and receivers ; that the action asked of the court was entirely for the administration of certain assets in the receivers' hands for the payment of pressing debts, and the authority to the receivers and company was to be granted contingently upon the subsequent approval of the security holders and stockholders, all the parties in interest ; that under the petition there was no question of rival plans of organization ; that there was no other scheme pending to avoid the impending foreclosure ; and that the receivers were not acting or asking for authority otherwise than with strict impartiality to the several interests involved, while the refusal of the prayer of the petition " would aid its opponents in depriving the whole body of the rest of the security holders and stockholders, of the opportunity of approving and consummating the scheme." He concluded that the granting of the prayer of the petition would not probably be misunderstood by the parties in interest, and even if it were, that fact, or that they would thereby authorize foreclosure, if the plan proved unsuccessful, should not prevent the action of the court otherwise proper ; that although the plan disposed of a large amount of the assets, this was not unadvisable, as it also disposed of a commercially equal amount of indebtedness, which would in any event absorb the proceeds of those, or an equal amount of other assets ; that any lien not before the

court or charter rights would not be affected without the consent of those interested, "unless of a very small minority, whose rights would be necessarily entirely protected in the usual manner in such cases;" "that the provisions for commissions are only an element of the net price to be obtained for the assets to be disposed of, and do not impair the obligation of the income mortgages;" that certain provisions of the plan for a voting trust were not invalid and furnished no ground of objection to the granting of the prayer; and that a full accounting or statement of all the affairs of the company was not necessary for the proper consideration of the questions involved.

The Circuit Court, in granting the application and entering the order prayed for, observed: "The order now to be made does not approve the proposed plan of reorganization, nor is either approval or disapproval thereof to be implied from it. The question of the wisdom and expediency of adopting any such scheme is for solution and determination by the persons interested, and no attempt to coerce their judgment or control their action should be made either by the court or the receivers. But nothing of that sort is involved in the authority now asked and given. It imposes no constraint, but leaves those who have the right to accept or to reject the plan referred to wholly free to do the one or the other, as they may see fit. It sanctions the raising of money by rightful means upon reasonable terms and for proper objects, and it is not a valid ground of objection to it that it also renders feasible, in case of due acceptance, the only reorganization project which is known to exist. The receivers should not enlist on either side in conflicts amongst those interested in the property they have in charge, but the neutrality, which it is their duty to observe, is not departed from by facilitating any plan which may be proposed for the general benefit, provided, that to all alike, and with regard to every plan advanced in good faith, the same facilities be indifferently accorded; and the court, whilst it will not pass upon the comparative merits of rival schemes of reorganization, will regard with satisfaction any and every legitimate effort to terminate this receivership."

The petitioner subsequently made application to the Circuit Court to set aside the decretal order upon the receivers' and companies' petition, and for leave to file a demurrer, plea, and answer to that petition; and that if the demurrer or plea should be overruled, a reference be had, and evidence adduced for and against the proposed action, and for a stay in the meantime; and, in the alternative, that the decretal order be opened with leave to petitioner to file, *nunc pro tunc*, such demurrer, plea, or answer, and with leave to file, *nunc pro tunc*, exceptions to the master's report upon the ground that such proceedings had been had and decree made without regard to the rules and regulations of practice; and for general relief; which application the Circuit Court denied.

Petitioner thereupon applied to this court for leave to file a petition for a writ of prohibition to prohibit the Circuit Judge from further proceeding upon the petition of the receivers, and from enforcing or carrying out the decree thereunder; and for a writ of mandamus directing the Circuit Judge to cause securities, deposited under the proposed plan, to be returned to their owners, and to restore the parties to their original positions, or to vacate the decree and require the parties in interest to be brought in, and thereafter to proceed according to the rules and forms of law for such cases made and provided.

*Mr. Nathan Bijur* for petitioner.

*Mr. Thomas Hart, Jr.*, and *Mr. Samuel Dickson*, opposing.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

Without discussing the various matters urged upon our attention by counsel for the petitioner, it is sufficient to say that we are of opinion that the leave asked for cannot be granted.

1. Where it appears that the court whose action is sought to be prohibited has clearly no jurisdiction of the cause originally, or of some collateral matter arising therein, a party who has objected to the jurisdiction at the outset and has no other remedy is entitled to a writ of prohibition as a matter

of right. But where there is another legal remedy by appeal or otherwise, or where the question of the jurisdiction of the court is doubtful, or depends on facts which are not made matter of record, or where the application is made by a stranger, the granting or refusal of the writ is discretionary. Nor is the granting of the writ obligatory where the case has gone to sentence, and the want of jurisdiction does not appear upon the face of the proceedings. *Smith* v. *Whitney*, 116 U. S. 167, 173; *In re Cooper*, 143 U. S. 472, 495. Tested by these rules, we are clear that a proper case is not made for awarding the writ of prohibition.

2. The writ of mandamus cannot be issued to compel the court below to decide a matter before it in a particular way, or to review its judicial action had in the exercise of legitimate jurisdiction. The writ cannot be used to perform the office of an appeal or writ of error, even if no appeal or writ of error is given by law. *American Construction Company* v. *Jacksonville Railway*, 148 U. S. 372, 379.

The Circuit Court has proceeded to judgment in the premises, and we cannot revise and reverse its decision by resort to this writ in the manner proposed, nor can we command it to adjudicate upon the rights of parties not before it, by directing it to cause securities which may have been deposited to be returned to their owners, and to restore the parties to their original positions. Still less can we direct the hearing of further argument, because counsel may consider that the opportunity for the expression of his views and the presentation of objections has not been as ample as in his opinion should have been afforded. The mere fact that, in the administration of the assets of an insolvent corporation in the custody of receivers, summary proceedings are resorted to, does not in itself affect the jurisdiction of the Circuit Court as having proceeded in excess of its powers, and, where notice has been given and hearing had, the result cannot properly be interfered with by mandamus. *Ex parte Parsons*, 150 U. S. 150.

We perceive no ground for the extraordinary interposition of this court by the issue of either of the writs applied for.

*Leave denied.*