KIMBERLIN v. COMMISSION TO FIVE CIVILIZED TRIBES et al.

(Circuit Court of Appeals, Eighth Circuit.    October 15, 1900.)

No. 1,388.

**1. MANDAMUS—WHEN ISSUABLE.**

Mandamus issues to compel a person or officer to discharge a duty imposed by law.

**2. SAME—MAY COMMAND DECISION.**

If the duty of the officer involves the exercise of his judgment or discretion, a writ of mandamus may issue to compel him to act and decide, but not to direct in what way or in whose favor he shall decide.

3. SAME—JUDICIAL OFFICER.

While the writ of mandamus may issue to compel a judicial officer to decide a case or question, it may not lawfully command him in what particular way he shall decide it; nor may it be used to review his decision, to correct his errors, or to compel him to again decide the question.

4. SAME—EXECUTIVE OFFICER—MINISTERIAL ACT.

A writ of mandamus may lawfully issue from a court having jurisdiction to compel an executive officer to perform a mere ministerial act, which does not call for the exercise of his judgment or discretion, but which the law gives him the power and imposes upon him the duty to do.

5. SAME—EXECUTIVE OFFICER—DISCRETIONARY ACTS.

It may issue to command an executive officer to act and to decide, even though his act and decision involve the exercise of his judgment and discretion, but in such case it may not direct him in what particular way he shall act or decide. It may not lawfully issue to command or control an executive officer in the discharge of those of his duties which involve the exercise of his judgment or discretion, either in the construction of the law, or in determining the existence or effect of the facts.

6. SAME—EXECUTIVE OFFICER—DISCRETIONARY ACTS NOT REVIEWABLE BY.

It may not lawfully issue to review, reverse, or correct the erroneous decisions of an executive officer in such cases, even though there may be no other method of review or correction provided by law.

7. COMMISSION TO THE FIVE CIVILIZED TRIBES—SPECIAL TRIBUNAL TO DETERMINE TRIBAL CITIZENSHIP—EXEMPT FROM MANDAMUS.

The commission to the Five Civilized Tribes, created by the acts of congress of March 3, 1893 (27 Stat. 645, c. 209, § 16), March 2, 1895 (28 Stat. 939, c. 189), June 10, 1896 (29 Stat. 339, c. 398), June 7, 1897 (30 Stat. 84, c. 3), and June 28, 1898 (30 Stat. 502, c. 517, § 21), is a special tribunal, vested with judicial power to hear and determine the claims of all applicants to it for citizenship in the Five Nations in accordance with the provisions of these acts of congress; and the courts have no jurisdiction, by the use of the writ of mandamus, to correct its errors, control its decisions, review or reverse its judgments, or to compel it to make different decisions upon these questions.

8. SAME.

The claim of an applicant for citizenship in the Chickasaw Nation was heard and denied by the commission to the Five Civilized Tribes. *Held*, the writ of mandamus to compel the commission to enroll the applicant whose claim had been denied was properly refused, because to grant it would be to substitute the judgment of the court for the judgment of the commission to which congress intrusted the determination of the right of the applicant.

(Syllabus by the Court.)

In Error to the United States Court of Appeals in the Indian Territory.

Mary Jane Kimberlin, a white woman, the plaintiff in error, seeks by this writ of error to obtain a writ of mandamus to the commission to the Five Civilized Tribes, commanding it to enroll her as a citizen of the Chickasaw Nation. Her right to the writ rests upon the facts disclosed by her amended complaint, which were admitted by a demurrer. Those facts were these: William G. Kimberlin, a white man, married Lizzie Mitchell, a Chickasaw Indian by blood, in the year 1870, and she died. After her death, and in the year 1890, Kimberlin married the plaintiff in error. Both these marriages were solemnized in conformity with the laws and rules of the Chickasaw Nation. The plaintiff in error's name has been upon the judicial records of that nation as a citizen of the tribe by intermarriage ever since November 19, 1890, through the record of her marriage license and marriage certificate. But the Chickasaw Nation has no official and settled roll of its citizens approved by its legislature. The plaintiff in error presented these facts to the commission to the Five Civilized Tribes by petition on August 28, 1897, and obtained

a hearing thereon on September 21, 1898. in accordance with the published notices, rules, and regulations of the commission. At this hearing the facts relative to the marriages and their records were admitted. but nevertheless the commission refused to enroll the plaintiff in error as a citizen of the Chickasaw Nation; and thereupon she filed her complaint for a mandamus' to compel it to do so, in the United States court in the Indian Territory. That court sustained a demurrer to her amended complaint, and denied the application for the writ of mandamus. This decision was removed by writ of error to the United States court of appeals in the Indian Territory, where it was affirmed by the latter court (53 S. W. 467), and that judgment is now here for review. The plaintiff in error insists that it was the clear duty of the commission, under the acts of congress. the treaty with the Chickasaw Nation, and the laws of that nation, to enroll her as a member of that tribe, and that the courts below ought to have enforced the performance of that duty by the issue of the writ of mandamus.

Albert Rennie and John A. McClure, for plaintiff in error.

William B. Johnson, for defendants in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The writ of mandamus issues to compel the performance of a plain duty imposed by law. Where that duty is the exercise of judgment or discretion by an officer in the decision of a question of law or fact, or both, it may issue to compel a decision, but it may not command him in what particular way that decision shall be rendered. When a question has been decided by the officer or person to whose judgment or discretion the law has intrusted its determination, the writ of mandamus may not issue to review or reverse that decision, or to compel another. It may issue to command judicial officers to hear and to decide a question within their jurisdiction, but courts have no power by writ of mandamus to direct such officers how they shall decide such a question, or in whose favor they shall render their judgment, because such action would result in the substitution of the judgment and opinion of the commanding court for that of the judicial officers to whose judgment and discretion the law intrusted the decision of the issue. For the same reason it cannot be invoked to compel a court or a judicial officer to reverse a decision already rendered, to correct an erroneous conclusion, or to render another decision, even though there may be no other method provided by the law for the review or correction of the error. In re Harless, 85 Fed. 177, 180, 29 C. C. A. 78, 81, 56 U. S. App. 33, 37; In re Rice, 155 U. S. 396, 403, 15 Sup. Ct. 149, 39 L. Ed. 198; American Const. Co. v. Jacksonville, T. & K. W. Ry. Co., 148 U. S. 372, 379, 13 Sup. Ct. 758, 37 L. Ed. 486; In re Parsons, 150 U. S. 150, 156, 14 Sup. Ct. 50, 37 L. Ed. 1034; Ex parte Morgan, 114 U. S. 174, 5 Sup. Ct. 825, 29 L. Ed. 935; Ex parte Whitney, 13 Pet. 404, 10 L. Ed. 221; In re Atlantic City R. Co., 164 U. S. 633, 635, 17 Sup. Ct. 208, 41 L. Ed. 579; In re Westervelt, 98 Fed. 912, 39 C. C. A. 350. The extent to which this writ is available to control the action of executive officers has been the subject of repeated consideration and decision in this country, until it is no longer doubtful. The leading cases upon the question are Marbury v. Madison, 1 Cranch, 137, 158, 161, 2 L.

Ed. 60; Kendall v. U. S., 12 Pet. 524, 613, 9 L. Ed. 1181; Decatur v. Paulding, 14 Pet. 497, 514, 516, 10 L. Ed. 559; and U. S. v. Black, 128 U. S. 40, 48, 9 Sup. Ct. 12, 32 L. Ed. 354. In Marbury v. Madison, 1 Cranch, 137, 158, 161, 2 L. Ed. 60, President Adams had nominated, the senate had confirmed, and the president had commissioned, Marbury as a justice of the peace of the District of Columbia, but his commission remained undelivered in the office of the secretary of state when the government passed under the administration of President Jefferson. Mr. Madison, the new secretary of state, refused to deliver the commission, and Marbury applied to the supreme court for a writ of mandamus to compel him to do so. The court held that the appointment was complete, that Marbury was entitled to his commission, that it was Mr. Madison's duty to deliver it, that its delivery involved the exercise of no discretion or judgment, and that it could be compelled by a writ of mandamus issued by the proper court. In Kendall v. U. S., 12 Pet. 524, 613, 9 L. Ed. 1181, Stockton and Stokes held certain claims against the United States for extra services as contractors for carrying the mails, which they insisted should be credited to their accounts in the post-office department of the government. Thereupon congress passed an act for their relief, which provided that the solicitor of the treasury should examine all the evidence relative to this claim, and should find and determine the amounts of the allowances to which they were equitably entitled, and that the postmaster general should credit them in their account in his department with the sums which the solicitor should find to be due to them. Under this act the solicitor examined the evidence and found the amounts due to the contractors; but Kendall, the postmaster general, refused to credit them with these sums, and a writ of mandamus was sought to compel him to do so. The supreme court held that the act of congress imposed upon the postmaster general the clear duty to credit the contractors with the sums found due to them by the solicitor, that this was a mere ministerial act, that it did not involve the exercise of any judgment or discretion on his part, and that the peremptory writ commanding him to enter this credit was lawfully issued by the court below. In delivering the opinion of the supreme court, Mr. Justice Thompson said:

"The act required by the law to be done by the postmaster general is simply to credit the relators with the full amount of the award of the solicitor. This is a precise, definite act, purely ministerial, and about which the postmaster general has no discretion whatever."

In Decatur v. Paulding, 14 Pet. 497, 514, 516, 10 L. Ed. 559, congress passed on the same day a general law giving to the widow of any officer who had died in the naval service a pension equal to half of his monthly pay from the time of his death until her death or marriage; and a resolution granting a pension to Mrs. Decatur, widow of Stephen Decatur, for five years, commencing June 30, 1834, and the arrearages of the half pay of a post captain from Commodore Decatur's death to June 30, 1834. Mrs. Decatur reserved her rights under the resolution, and applied for and received her pension under the general law. Thereafter she applied for her pen-

sion under the resolution, the secretary of the navy refused to allow it, and she sought a writ of mandamus to compel him to do so. The circuit court refused to issue the writ, and the supreme court sustained its action, because the acts of congress had vested the power and imposed the duty upon the secretary of the navy, in the allowance or disallowance of this pension, to exercise his judgment and discretion in the construction of the law and the resolution, and in the decision of the question whether Mrs. Decatur was entitled to her pension under the law only, or under both the law and the resolution. It was strenuously argued in that case, as it is in the case at bar, that the true construction of the legislation constituted the law of the case, that it was the duty of the officer to comply with that law, and that, as the facts were not in dispute, his compliance with the law was a mere ministerial act, and he had no power to exercise his judgment or discretion in the construction of the act and the resolution. This contention, however, was not sustained. Chief Justice Taney, in delivering the opinion of the supreme court, said:

"The head of an executive department of the government, in the administration of the various and important concerns of his office, is continually required to exercise judgment and discretion. He must exercise his judgment in expounding the laws and resolutions of congress under which he is from time to time required to act."

And after reviewing the case of Kendall v. U. S., and calling attention to the act of entering the credit in the account which was in question in that case, he further said:

"The court were unanimously of opinion that in its character the act was merely ministerial. In the case before us it is clearly otherwise. The resolution in favor of Mrs. Decatur imposed a duty on the secretary of the navy which required the exercise of judgment and discretion, and in such a case the circuit court had no right, by mandamus, to control his judgment, and guide him in the exercise of a discretion which the law had confided to him."

In U. S. v. Black, 128 U. S. 40, 48, 9 Sup. Ct. 12, 32 L. Ed. 354, Oscar Dunlap applied to the supreme court of the District of Columbia for a writ of mandamus commanding the commissioner of pensions to increase his pension. He averred in his petition that the fact was that he was so disabled that he was entitled to this increase under the acts of congress, and that the commissioner had so found the fact to be, but had erroneously held that under the law he was not entitled to it, and for that reason he refused to allow it. The writ was refused, and that judgment was affirmed in the supreme court. Mr. Justice Bradley delivered the opinion. He carefully reviewed the cases of Kendall v. U. S. and Decatur v. Paulding, and then said:

"The principle of law deducible from these two cases is not difficult to enounce. The court will not interfere by mandamus with the executive officers of the government in the exercise of their ordinary official duties, even where those duties require an interpretation of the law, the court having no appellate power for that purpose; but when they refuse to act in a case at all, or when by special statute, or otherwise, a mere ministerial duty is imposed upon them (that is, a service which they are bound to perform without further question), then, if they refuse, a mandamus may be issued to compel them. Judged by this rule, the present case presents no difficulty. The

commissioner of pensions did not refuse to act or decide. He did act and decide. He adopted an interpretation of the law adverse to the relator, and his decision was confirmed by the secretary of the interior, as evidenced by his signature of the certificate. Whether, if the law were properly before us for consideration, we should be of the same opinion, or of a different opinion, is of no consequence in the decision of this case. We have no appellate power over the commissioner, and no right to review his decision. That decision and his action taken thereon were made and done in the exercise of his official functions. They were by no means merely ministerial acts."

From these four cases, and from the later decisions of the supreme court which have followed and emphasized the limit of the control which courts may exercise by mandamus over the acts of the executive officers of the government, which those decisions clearly fixed, the following established rules may be logically deduced: (1) A writ of mandamus may lawfully issue, from a court having jurisdiction, to compel an executive officer to perform a mere ministerial act, which does not call for the exercise of his judgment or discretion, but which the law gives him the power and imposes upon him the duty to do. Marbury v. Madison, 1 Cranch, 137, 158, 161, 2 L. Ed. 60; Kendall v. U. S., 12 Pet. 524, 613, 9 L. Ed. 1181; U. S. v. Schurz, 102 U. S. 378, 26 L. Ed. 167; Butterworth v. Hoe, 112 U. S. 50, 5 Sup. Ct. 25, 28 L. Ed. 656. (2) It may issue to command an executive officer to act and to decide, even though his act and decision involve the exercise of his judgment and discretion; but in such a case it may not direct him in what particular way he shall act or decide. It may not lawfully issue to command or control an executive officer in the discharge of those of his duties which involve the exercise of his judgment or discretion either in the construction of the law, or in determining the existence or effect of the facts. (3) It may not lawfully issue to review, reverse, or correct the erroneous decisions of an executive officer in such cases, even though there may be no other method of review or correction provided by law. Decatur v. Paulding, 14 Pet. 497, 514, 516, 10 L. Ed. 559; U. S. v. Black, 128 U. S. 40, 48, 9 Sup. Ct. 12, 32 L. Ed. 354; U. S. v. Guthrie, 17 How. 284, 15 L. Ed. 102; Commissioner v. Whiteley, 4 Wall. 522, 18 L. Ed. 335; Georgia v. Stanton, 6 Wall. 50, 18 L. Ed. 721; Gaines v. Thompson, 7 Wall. 347, 19 L. Ed. 62; U. S. v. Windom, 137 U. S. 636, 644, 11 Sup. Ct. 197, 34 L. Ed. 811; U. S. v. Blaine, 139 U. S. 306, 319, 11 Sup. Ct. 607, 35 L. Ed. 183; U. S. v. Lamont, 155 U. S. 303, 308, 15 Sup. Ct. 97, 39 L. Ed. 160.

Let us apply these rules to the solution of the question which this case presents. The commission to the Five Civilized Tribes was created by the act of March 3, 1893, making appropriations for current and contingent expenses, and for fulfilling treaty obligations with Indian tribes (27 Stat. 645, c. 209, § 16), to negotiate an extinguishment of the tribal title, and an allotment in severalty of the lands of the Cherokee Nation, the Choctaw Nation, the Chickasaw Nation, the Muskogee (or Creek) Nation, and the Seminole Nation. Under this act the president appointed three commissioners, and they entered upon the discharge of their duties. By the act of March 2, 1895, making appropriations for sundry civil expenses of the government, the president was authorized to appoint two additional com-

missioners, and a suitable appropriation was made to enable the commission to continue its work.   28 Stat. 939, c. 189.   By the act of June 10, 1896 (29 Stat. 339, c. 398), making appropriations for current and contingent expenses of the Indian department, this commission was directed to continue to exercise the authority conferred upon it, and it was charged with the duty of hearing and deciding upon all applications made to it for citizenship in any of the Five Nations, in these words:

"That said commission is further authorized and directed to proceed at once to hear and determine the application of all persons who may apply to them for citizenship in any of said nations, and after such hearing they shall determine the right of such applicant to be so admitted and enrolled: provided, however, that such application shall be made to such commissioners within three months after the passage of this act.   The said commission shall decide all such applications within ninety days after the same shall be made. That in determining all such applications said commission shall respect all laws of the several nations or tribes, not inconsistent with the laws of the United States, and all treaties with either of said nations or tribes, and shall give due force and effect to the rolls, usages and customs of each of said nations or tribes: and provided, further, that the rolls of citizenship of the several tribes as now existing are hereby confirmed, and any person who shall claim to be entitled to be added to said rolls as a citizen of either of said tribes and whose right thereto has either been denied or not acted upon, or any citizen who may within three months from and after the passage of this act desire such citizenship, may apply to the legally constituted court or committee designated by the several tribes for such citizenship and such court or committee shall determine such application within thirty days from the date thereof.   In the performance of such duties said commission shall have power and authority to administer oaths, to issue process for and compel the attendance of witnesses, and to send for persons and papers, and all depositions and affidavits and other evidence in any form whatsoever heretofore taken where the witnesses giving said testimony are dead or now residing beyond the limits of said territory, and to use every fair and reasonable means within their reach for the purpose of determining the rights of persons claiming such citizenship, or to protect any of said nations from fraud or wrong, and the rolls so prepared by them shall be hereafter held and considered to be the true and correct rolls of persons entitled to the rights of citizenship in said several tribes: provided, that if the tribe, or any person, be aggrieved with the decision of the tribal authorities or the commission provided for in this act, it or he may appeal from such decision to the United States district court: provided, however, that the appeal shall be taken within sixty days, and the judgment of the court shall be final.   That the said commission, after the expiration of six months, shall cause a complete roll of citizenship of each of said nations to be made up from their records, and add thereto the names of citizens whose right may be conferred under this act, and said rolls shall be, and are hereby, made rolls of citizenship of said nations or tribes, subject, however, to the determination of the United States courts, as provided herein."

By the act of June 7, 1897, making appropriations for the current and contingent expenses of the Indian department (30 Stat. 84, c. 3), it was provided:

"That said commission shall continue to exercise all authority heretofore conferred on it by law to negotiate with the Five Tribes and any agreement made by it with any one of said tribes, when ratified, shall operate to suspend any provisions of this act if in conflict therewith as to said nation: provided, that the words 'rolls of citizenship,' as used in the act of June tenth, eighteen hundred and ninety-six, making appropriations for current and contingent expenses of the Indian department and fulfilling treaty stipulations with various Indian tribes for the fiscal year ending June thirtieth,

eighteen hundred and ninety-seven, shall be construed to mean the last authenticated rolls of each tribe which have been approved by the council of the nation, and the descendants of those appearing on such rolls, and such additional names and their descendants as have been subsequently added, either by the council of such nation, the duly authorized courts thereof, or the commission under the act of June tenth, eighteen hundred and ninety-six. And all other names appearing upon such rolls shall be open to investigation by such commission for a period of six months after the passage of this act. And any name appearing on such rolls and not confirmed by the act of June tenth, eighteen hundred and ninety-six, as herein construed, may be stricken therefrom by such commission where the party affected shall have ten days' previous notice that said commission will investigate and determine the right of such party to remain upon such roll as a citizen of such nation: provided, also, that any one whose name shall be stricken from the roll by such commission shall have the right of appeal, as provided in the act of June tenth, eighteen hundred and ninety-six."

In 1898, by the act of June 28th, for the protection of the people of the Indian Territory (30 Stat. 502, c. 517, § 21), congress declared that the roll of the Cherokee citizens of 1880 was the roll intended to be confirmed by that and preceding acts of congress, and then made this enactment:

"Said commission is authorized and directed to make correct rolls of the citizens by blood of all the other tribes, eliminating from the tribal rolls such names as may have been placed thereon by fraud or without authority of law, enrolling such only as may have lawful right thereto, and their descendants born since such rolls were made, with such intermarried white persons as may be entitled to Choctaw and Chickasaw citizenship under the treaties and the laws of said tribes."

It was under these various provisions of the acts of congress that the commission to the Five Civilized Tribes heard the claim of the plaintiff in error, and decided that it could not enroll her as a citizen of the Chickasaw Nation. In reaching this conclusion this commission was necessarily required to consider these various acts of congress, and to determine in the first instance whether or not it had the power to hear and determine the merits of the application of the plaintiff in error at the late day when she filed it. If it determined this question in the affirmative, it was then compelled to consider and determine the legal effect of articles 26 and 38 of the treaty with the Choctaws and Chickasaws (14 Stat. 777, 779), of section 7 of the general provisions of the Chickasaw constitution, which was adopted in 1867 (Constitution, Treaties, and Laws of the Chickasaw Nation, 1890, p. 19), and of the amendments of the laws of the Chickasaw Nation enacted by its legislature on September 24, 1887 (Constitution, Treaties, and Laws of the Chickasaw Nation, p. 143, § 3), and on October 1, 1890 (Codified Laws of the Chickasaw Nation, 1899, p. 270). These provisions of the treaty, of the constitution, and of the statutes read in this way:

"Art. 26. The right here given to Choctaws and Chickasaws, respectively, shall extend to all persons who have become citizens by adoption or intermarriage of either of said nations, or who may hereafter become such." 14 Stat. 777.

"Art. 38. Every white person who, having married a Choctaw or Chickasaw, resides in the said Choctaw or Chickasaw Nation, or who has been adopted by the legislative authorities, is to be deemed a member of said nation, and shall be subject to the laws of the Choctaw and Chickasaw Nations

according to his domicile, and to prosecution and trial before their tribunals, and to punishment according to their laws in all respects as though he was a native Choctaw or Chickasaw." 14 Stat. 779.

"Sec. 7. That every white person, who having married a Chickasaw Indian, or who has been adopted by the legislative authorities of said nation shall be entitled to all the rights, privileges and immunities guaranteed to them only by the thirty-eighth article of the treaty of 1866, with the Choctaw and Chickasaw Indians." Constitution, Treaties, and Laws of the Chickasaw Nation, p. 19.

The amendment of 1887 provides:

"That no marriage heretofore solemnized, or which may hereafter be solemnized, between a citizen of the United States and a member of the Chickasaw Nation, shall enable such citizen of the United States, to confer any right or privilege whatever, in this nation, by again marrying another citizen of the United States, or upon such other citizen of the United States or their issue." Constitution, Treaties, and Laws of the Chickasaw Nation, p. 143.

The amendment of 1890 provides:

"That every United States citizen who has heretofore become a citizen of the Chickasaw Nation or who may hereafter become such by intermarriage and be left a widow or widower by the decease of a Chickasaw wife or husband such surviving widow or widower shall continue to enjoy the rights of citizenship unless he or she shall marry another United States citizen, man or woman as the case may be, having no right of Chickasaw citizenship by blood, in that case all his or her rights as citizens shall cease, and shall forfeit all rights of citizenship in this nation." Codified Laws of the Chickasaw Nation, 1899, p. 270.

The question in hand is whether, under the provisions of the acts of congress, of the treaty, and of the constitution and laws of the Chickasaw Nation, it is the province of the courts to control the decisions or correct the errors of the commission to the Five Civilized Tribes in its determination of the questions of tribal citizenship, by the use of the writ of mandamus. If that commission had refused to hear and determine the application of the plaintiff in error, the writ might have issued to compel it to render a decision. But it has decided the question, and has held that the commission cannot lawfully enroll the applicant. The relief sought by this writ is not a decision, but the reversal of a decision already rendered by the commission. Was there any error in the refusal of the courts below to use the writ to accomplish this effect? The act of June 10, 1896, limited the time within which applicants might present their claims for citizenship to three months from its date. It provided for a speedy determination of the questions presented by the various applications, and gave to each applicant a right to a review of the action of the commission by an appeal to the federal court. The plaintiff in error did not file her application within the time limited by this act, and by her laches she lost the right of appeal, if she did not also lose the right to a hearing. There may be grave doubt whether or not at the time she filed her application, in September, 1897, or at any time thereafter, the commission had jurisdiction to hear and determine it, or to enroll her as a citizen. If it had no such power, it goes without saying that the writ of mandamus was properly denied, because no court should command any officer to do an act be-

yond his jurisdiction. Conceding, however, but not deciding, that the application of the plaintiff in error was in time to entitle her to a hearing and decision, that the facts which she alleged were admitted, and that it was the duty of the commission to hear and decide the question of her right to citizenship according to the law and the very right of the matter, the power and duty of the courts below and of this court are no less certain. It is conceded that the commissioners are executive officers. It is not their sole or chief function to hear and determine controversies between contending parties. Nevertheless, in the determination of the citizenship of the parties who apply to them for membership in the Five Nations, they are vested with judicial powers by the acts of congress. They have authority to compel the attendance of witnesses, to send for persons and papers, to hear evidence, "to use every fair and reasonable means within their reach for the purpose of determining the rights of persons claiming such citizenship," and above all they are empowered "to hear and determine the application of all persons who apply to them for citizenship." This grant of power is plenary. It vests the authority and imposes the duty upon this commission to hear and to decide every question of law and of fact which is material to the right of the applicant to enrollment as the citizen of a nation. Take the case at bar. The facts are conceded. But do these facts entitle the applicant to be enrolled as a citizen of the Chickasaw Nation? Does the provision of article 38 of the treaty of 1866, that "every white person who, having married a Choctaw or Chickasaw, resides in said Choctaw or Chickasaw Nation * * * is to be deemed a member of said nation," apply to those who, like the plaintiff, were married subsequent to the adoption of the treaty? Are the amendments of the laws of the Chickasaw Nation made by its legislature in 1887 and in 1890, which by their terms prohibit the plaintiff from acquiring any rights of citizenship in that nation by her intermarriage with the white widower of a deceased Indian woman, void, in the face of the treaty, or are they consistent with its provisions and with the acts of congress, and fatal to the claim of the plaintiff in error? The consideration and decision of these questions were indispensable to the determination of the plaintiff in error's right to the citizenship she sought, and the acts of congress intrusted their consideration and decision to the judgment and discretion of the commission, and not to those of the courts. Under these acts of congress the commission to the Five Civilized Tribes is a special tribunal, vested with judicial power to hear and determine the claims of all applicants to citizenship in the Five Tribes, and its enrollment or refusal to enroll the applicant in each particular case constitutes its judgment in that cause. In the case before us this tribunal has heard and determined the claim of the plaintiff. Whether its decision was right or wrong is immaterial in this court, and that question will not be considered. Congress saw fit to intrust to the judicial discretion of the commission the determination of the application of the plaintiff in error, and of every question of law and of fact which that decision involved. Under the settled rules to which attention was called in the opening of this opinion, no

court has jurisdiction by the use of the writ of mandamus to substitute its own opinion for that of the tribunal to which the law intrusted the decision of these questions, to control the judicial discretion of that tribunal, to correct its errors, or to reverse its decision. The judgments of the courts below were right, and they are affirmed.