## STOUT v. SIMPSON.

No. 1615.  Opinion Filed June 25, 1912.

(124 Pac. 754.)

1.  **INDIANS—Lands—Conveyances.** Under section 8 of the Act of Congress of March 3, 1903, c. 994, 32 St. at L. 982, which provided that the homestead of 40 acres shall be inalienable during the lifetime of the allottee, not exceeding 21 years from the date of the deed for the allotment, the death of the allottee removes the restrictions, and a deed executed and delivered by the adult full-blood heirs of the deceased full-blood Seminole Indian, made subsequent to allotment and prior to April 26, 1906, conveys a good title to such homestead allotment regardless of the fact that the patent thereto has not been delivered.

2.  **SAME.** A deed made October 13, 1908, by the sole heirs at law of a deceased Seminole Indian, both deceased, and the heirs being full-blood Indians, to the surplus allotment of the deceased, when approved by the court having jurisdiction of the settlement of the estate of the deceased allottee, and otherwise valid, conveys to the grantee thereunder · a good title to such allotment, though no patent thereto has ever issued.

3.  **SAME—Lease.** Neither the Seminole Agreement of December 16, 1897 (Act July 1, 1898, c. 542, 30 St. at L. 567), nor the Act of April 26, 1906, c. 1876, 34 St. at L. 137, contains restrictions forbidding the adult full-blood heirs of a deceased Seminole allottee from leasing, for a term of five years, lands allotted to their deceased ancestor.

4.  **SAME.** The heirs of such deceased allottee may lease allotted lands inherited by them, and such a lease, made January 20, 1908, in order that it shall be valid against third persons, is governed by section 1195, Comp. Laws 1909; there being no treaty provision or act of Congress regulating the making, execution, or recording of leases of inherited Seminole lands.

5.  **SAME—Sale—"Any Part."** In the Original Seminole Agreement of December 16, 1897 (Act July 1, 1898, c. 542, 30 St. at L. 567), providing that all contracts for ˙ sale, disposition, or in-

cumbrance of any part of any allotment made prior to the date of patent shall be void, ''any part' applies either to the homestead or surplus allotment.

6.      SAME—Sale "Any Allotment." In the Original Seminole Agreement of December 16, 1897 (Act July 1, 1898, c. 542, 30 St. at L. 567), providing that all contracts for sale, disposition, or incumbrance of any part of any allotment made prior to patent shall be void, "any allotment" has reference to all allotted lands, whether set apart directly to the allottee or descending to the heirs of the allottee upon his or her death.

7.      SAME—"Incumbrance." In the Original Seminole Agreement of December 16, 1897 (Act July 1, 1898, c. 542, 30 St. at L. 567), providing that all contracts for incumbrance of any part of any allotment prior to patent shall be void, an "incumbrance" is a right or interest in land which may subsist in third persons to the diminution of the value of the land, but consistent with the passing of the fee by conveyance.

(Syllabus by Sharp, C.)

*Error from District Court, Seminole County;*
*Robt. M. Rainey, Judge.*

Action by J. R. Simpson against T. A. Stout. Judgment for plaintiff, and defendant brings error. Reversed, and new trial granted.'

Defendant in error, plaintiff below, instituted in the district court of Seminole county an action to recover possession of the N. ½ of the N. W. ¼ and the S. W. ¼ of the N. W. ¼ of section 14, township 8 north, range 6 east, situated in Seminole county, Okla., and for rents accruing thereon during the time' that plaintiff was kept out of possession. Upon issues joined a jury was waived, and the issues both of law and fact were submitted to the court. The lands above described were allotted to Louisa Harjoche, a full-blood Seminole Indian, prior to. her death, which occurred November 21, 1901. That of the lands above described, the S. W. ¼ of the N. W. ¼ of said section 14, constituted the homestead; the remainder the surplus allotment. That said Louisa Harjoche left surviving her as her sole heirs at law, her mother, Hannah Harjoche, and her brothers, Tecumseh Harjoche, alias Crane, and Frank Harjoche, alias Crane. That the above-named heirs on the 29th day of January, 1906, by warranty deed sold and conveyed said 120

acres of land to O. D. Strother, which deed on the second day
following its execution was placed of record in the office of the
deputy clerk and *ex-officio* recorder of deeds at Wewoka, Ind.
T. That thereafter, and on the 4th day of December, 1907, the
said grantors executed a second deed to said O. D. Strother, to
the same lands included in the first deed, together with other
lands; all being described as the allotments of Fous Harjoche
and Louisa Harjoche. Thereafter and on the 13th day of Oc-
tober, 1908, the same grantors by warranty deed conveyed the
last-mentioned lands to the plaintiff, J. R. Simpson, and on the
same day procured from the county court of Seminole county an
order approving said deed, which order was thereafter and on
the 5th day of November, 1908, duly recorded in the office of
the register of deeds in said Seminole county. On the day of
the execution of the last deed, O. D. Strother by quitclaim deed
conveyed to the plaintiff all his right, title, and interest in and
to the first above-mentioned 120 acres of land, being the former
allotment of said Louisa Harjoche. Subsequent to the execution
of the first two deeds, and on the 20th day of January, 1908,
the said heirs of Julia Harjoche executed to the defendant a
lease on the lands inherited by them from the estate of Louisa
Harjoche, deceased, for a period of five years from the 1st day
of January, 1909, which lease was in writing, executed be-
fore a notary public, and on the day following its execution ap-
proved by John F. Brown, principal chief of the Seminole Na-
tion. It does not appear to have ever been recorded. On ob-
jection of counsel at the trial to the introduction of this lease it
was not admitted in evidence. The court submitted special
findings of fact, and conclusions of law, and rendered judgment
thereon in favor of plaintiff and against defendant, for the lands
in controversy, and for $175 rent, and the costs of suit.

*J. A. Baker,* for plaintiff in error.

*Crump, Rogers & Harris* and *J. Ross Bailey,* for defendant
in error.

*Davis & Davis* and *T. S. Cobb, amici curiae.*

Opinion by SHARP, C. (after stating the facts as above). The questions presented for our consideration are: First, what title, if any, did plaintiff acquire through mesne conveyance from O. D. Strother, the grantee in the deeds of January 29, 1906, and December 4, 1907? Second, what title, if any, did plaintiff acquire by virtue of the deeds of October 13, 1908? Third, if these deeds were invalid in part or in whole, what right did defendant acquire under his lease of January 20, 1908?

It is insisted by plaintiff in error that, due to the fact that no patents to allotted land in the Seminole Nation had been issued or delivered to the allottee, no title could pass under the first deed. None of the deeds were ever approved by the Secretary of the Interior. Prior to the act of April 26, 1906, the restrictions on the alienation of Seminole Indians by blood were as follows: The Original Seminole Agreement of December 16, 1897 (Act July 1, 1898, c. 542, 30 St. at L. 567) provided that all contracts for sale, disposition, or incumbrance of any part of any allotment made prior to date of patent should be void; that each allottee should designate one tract of 40 acres which· should by the terms of the deed be made inalienable and non-taxable as a homestead in perpetuity. In the matter of leasing the allotted lands the treaty provided:

"Any allottee may lease his allotment for any period not exceeding six years, the contract therefor to be executed in triplicate upon printed blanks provided by the tribal government, and before the same shall become effective it shall be approved by the principal chief and a copy filed in the office of the clerk of the United States Court at Wewoka."

The Appropriation Act of March 3, 1903, c. 994, 32 St. at L. 982, contained the following provision with reference to Seminole affairs:

"Sec. 8. That the tribal government of the Seminole Nation shall not continue longer than March fourth, nineteen hundred and six: Provided, that the Secretary of the Interior shall at the proper time furnish the principal chief with blank deeds necessary for all conveyances mentioned in the agreement with the Seminole Nation contained in the act of July first, eighteen hundred and ninety-eight (Thirtieth Statutes, page five hundred and sixty-seven), and said principal chief shall execute and de-

liver said deeds to the Indian allottees as required by said act, and the deeds for allotment, when duly executed and approved, shall be recorded in the office of the Dawes Commission prior to delivery and without expense to the allottee until further legislation by Congress, and such records shall have like effect as other public records; provided further, that the homestead referred to in said act shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of the deed for the allotment. A separate deed shall be issued for said homestead, and during the time the same is held by the allottee it shall not be liable for any debt contracted by the owner thereof."

Section 2 of the act of October 7, 1899 (Act June 2, 1900, c. 610, 31 St. at L. 250), known as the Seminole Supplemental Agreement, is very similar to a part of section 22 of the Choctaw and Chickasaw Agreement, approved July 1, 1902 (Act July 1, 1902, c. 1362, 32 St. at L. 641), while section 8 of the act of March 3, 1903, is similar in its meaning to section 12 of the said Chickasaw and Choctaw Treaty. No Seminole Indian could sell his or her allotment prior to the date of patent, and any contract for the sale, disposition, or incumbrance thereof, as we have observed, was by the terms of the Original Agreement made void. The restriction against alienation in such cases is the fact that the patents had not been executed and delivered. It is insisted by counsel for defendant in error that there has been found no agreement or act of Congress placing any restrictions upon the sale of inherited land, and that the restrictions heretofore named were intended only to prevent the alienation of allotted lands by the allottee thereof. We cannot agree with this conclusion. The language of the statute is: "All contracts for sale, disposition, or incumbrance of any part of any allotment made prior to date of patent shall be void." It would be difficult to employ words having a broader meaning. The words "any part" were intended, we think, to apply either to the homestead or surplus allotment, and the words "any allotment" had reference to any and all allotted lands whether set apart directly to the allottee, or that which descended to the heirs of the allottee upon his or her death. The word "allotment" as used is not necessarily confined to the individual allotment of the living allottee. It may none the less be described as an allotment, though

the allottee be dead, and the adjective "any" preceding the word "allotment" precludes all limitation upon the kind or class of allotment intended to be included.

Originally the homesteads of all Seminole allottees were made inalienable and nontaxable as a homestead in perpetuity, but in the act of March 3, 1903, this was changed, and from thenceforth the homestead of such allottee was made inalienable during the lifetime of the allottee, not exceeding 21 years from the date of the deed for the allotment. The only difference between this provision and that part of section 12 of the act of July 1, 1902, treating of the same subject, is that here the language of the statute reads "from date of the deed for the allotment," while the statute last mentioned reads "from date of certificate of allotment." The slight difference in the language used is immaterial where the allottee dies within the 21-year period. Construing section 12 of the said act of July 1, 1902, Mr. Justice Hughes, in *Mullen et al. v. United States*, 224 U. S. 453, 32 Sup. Ct. 497, 56 L. Ed. 834, decided April 15, 1912, said:

"It will be observed that the homestead lands are made inalienable 'during the lifetime of the allottee, not exceeding twenty-one years from the date of certificate of allotment.' The period of restriction is thus definitely limited, and the clear implication is that when the prescribed period expired the lands were to become alienable; that is, by the heirs of the allottee upon his death, or by the allottee himself at the end of the 21 years. Thus, with respect to homestead lands, the supplemental agreement imposed no restrictions upon alienation by the heirs of a deceased allottee."

That part of section 12 of the Chickasaw and Choctaw Treaty, which in part employs the same language as that of the act of March 3, 1903, had reference to allotments made by the living, as here. In the case last cited, in this connection the court said:

"Had the lands been allotted in the lifetime of the ancestor, one-half of them, constituting homestead, would have been free from restriction upon his death."

The last-mentioned clause of the act of March 3, 1903, doubtless was intended to work a repeal of that portion of the act of

December 16, 1897, providing that the 40-acre homestead of a
Seminole allottee should be made inalienable and nontaxable as
a homestead in perpetuity, though it may well be doubted but
that this provision in the original treaty would have rendered the
homestead alienable upon the death of the allottee, for as to him
it could then no longer remain the homestead, and, unless made
alienable at death, the question would then be presented, when,
if ever, would it become alienable? But we think the act of
March 3, 1903, in the light of the decision in *Mullen et al. v.
United States, supra,* makes clear the legislative intent, and that
as to the homestead allotment all restrictions theretofore exist-
ing were removed by the death of the allottee, and that the de-
livery of the patent was not a necessary essential. *Godfrey v.
Iowa Land & Trust Co.,* 21 Okla. 293, 95 Pac. 792; *Hancock
v. Mutual Trust Co.,* 24 Okla. 391, 103 Pac. 566; *Goat et al. v.
United States,* 224 U. S. 458, 32 Sup. Ct. 544, 56 L. Ed. ――.

Section 19 of the act of April 26, 1906, c. 1876, 34 St. at
L. 137, expressly provided that conveyances heretofore made by
members of any of the Five Civilized Tribes subsequent to the
removal of restrictions, where patents thereafter issue, shall not
be deemed or held invalid solely because said conveyances were
made prior to the issuance and recording or delivery of patent.
Therefore, where the restriction was removed by the death of
the allottee, the fact that the patent had not issued prior to aliena-
tion by the heirs, as to homesteads, is of no importance. As to
the surplus allotment, we are of the opinion that the restrictions
contained in the original act continued, and were in full force
and effect on the date of the deed of January 29, 1906, and that
as to said lands no title passed under said deed of conveyance.
*Goat et al. v. United States, supra.* Prior to the second deed
the act of April 26, 1906, took effect. Section 22 of said act
provided that the adult heirs of any deceased Indian of either of
the Five Civilized Tribes, whose selection had been made, or
to whom a deed or patent had been issued, for his or her share
of the land of the tribe to which he or she belongs or belonged,
may sell or convey the lands inherited from such decedent, but
provided that all conveyances made under such provision by the

full-blood Indian heirs should be subject to the approval of the Secretary of the Interior, under such rules and regulations as he might prescribe. No effort was made to comply with this act. Hence no rights attached under it. It will be noted that the introductory portion of this section is in the alternative, "That the adult heirs of any deceased Indian of either of the Five Civilized Tribes whose selection has been made, *or* to whom a deed or patent has been issued," etc., thus making it clear that, upon a compliance with the provisions of said section, after selection the issuance of a patent was no longer regarded as necessary.

Section 9 of the act of May 27, 1908, c. 199, 35 St. at L. 315, provided:

"That the death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land; provided, that no conveyance of any interest of any full-blood Indian heir in such land shall be valid unless approved by the court having jurisdiction of the settlement of the estate of said deceased allottee."

This provision, upon compliance with its terms, obviously removed all remaining restrictions upon the right to alienate inherited land by a full-blood Seminole Indian, regardless of the issuance and delivery of patent. Other provisions not necessary to consider follow. We do not understand that the regularity of the proceedings under which defendant in error obtained his deed of October 13, 1908, is in this court made an issue, but that counsel contend no title could be obtained prior to the delivery of patent, and that, if any title was acquired by said subsequent proceedings, it would be subject to the lease of defendant in error made on the 20th day of January, 1908. There is nothing in the brief of counsel for plaintiff in error directing our attention to any defect in either of the deeds or court proceedings of October 13, 1908, though objections to the introduction of testimony in that regard were made in the court below. Therefore we are of the opinion that by virtue of said last-mentioned conveyance, which was approved by the county court of Seminole county, and which court had jurisdiction of the settlement of the estate of the deceased allottee, Louisa Harjoche, there was

vested in the plaintiff a fee-simple title in and to the surplus allotment of said Louisa Harjoche, deceased, and that the act of May 27, 1908, removed the restrictions against 'sale imposed by the terms of the original agreement, so that, upon observance of its provisions, the delivery of patent was no longer a condition precedent to the authority of adult heirs to convey inherited allotted lands.

The remaining question to be considered is that of the validity of the defendant's lease. As we have seen, the original treaty made all contracts for sale, disposition, or incumbrance of any part of any allotment prior to date of patent void, while the section immediately following the above provision provided for leasing the individual allotment of the allottee. An "incumbrance" may be defined to be every right to or interest in land, which may subsist in third persons, to the diminution of the value of the land, but consistent with the passing of the fee by the conveyance. *Clark v. Fisher et al.*, 54 Kan. 403, 38 Pac. 493; *Brass v. Vandecar,* 70 Neb. 35, 96 N. W. 1035; *Albin v. Parmele et al.,* 73 Neb. 663, 103 N. W. 304; *Simons v. Diamond Match Co.,* 159 Mich. 241, 123 N. W. 1132; *Fritz v. Pusey,* 31 Minn. 368, 18 N. W. 94; *Crawford v. McDonald,* 84 Ark. 415, 106 S. W. 206; *Demars v. Koehler,* 62 N. J. 203, 41 Atl. 720, 72 Am. St. Rep. 642; *O'Connor v. Enos,* 56 Wash. 448, 105 Pac. 1039; *Mann v. Montgomery,* 6 Cal. App. 646, 92 Pac. 875. And if this section stood alone we would be constrained to hold that it included leases of inherited land.

The section following the last-mentioned restriction authorizes the leasing of allotted lands by the allottee upon the performance of certain enumerated conditions. The second and third sections following provided for the leasing of coal, mineral, coal oil, or natural gas, within the Seminole Nation. It was thus provided that both allotted lands, and under certain conditions tribal lands, might be leased. The object was manifestly to make productive, in the way of rents or royalties, the tribal as well as individual lands. There is no provision specifically authorizing the leasing of inherited allotted lands; neither is there any specific restriction against the making of such leases unless

it be that the word "incumbrance," as used, was intended to forbid or prohibit the making of leases to inherited lands by those who had succeeded to the estate. All leases affecting the individual allotment were submitted for approval to the principal chief of the Seminole Nation, thus making unnecessary any further superintending control on the part of the general government, and it would be absurd to say that, while this character of leases were thus made easy, Congress intended, under any and all circumstances, to prohibit the leasing of inherited lands. To hold that Congress intended that these estates, many in number, should thus lie idle for an uncertain number of years, unless, or course, cultivated by the heirs, would be to accuse Congress of most absurd legislation, and, not being required to do so, we should not place on said act a construction obviously against the spirit of the law, and which would at the same time injure instead of benefit those whom the general government has ever regarded as its wards, and in whose interest such legislation is supposedly directed. Besides, it would be manifestly inappropriate to imply restrictions where the intent itself is not clear. *Mullen et al. v. United States, supra; Goat et al. v. United States, supra; Godfrey v. Iowa Land & Trust Co.,* 21 Okla. 293, 95 Pac. 792; *Hancock v. Mutual Trust Co.,* 24 Okla. 391, 103 Pac. 566. Whatever may have been the congressional intent, we fail to find in either of said acts, or in the act of April 26, 1906, any restriction in terms, or by clear implication, either denying, limiting, or regulating the right of full-blood Seminole heirs to lease inherited lands. Having so concluded, that portion of section 20 of the act of April 26, 1906, providing that leases for more than one year shall be recorded in conformity to the law applicable to recording instruments then in force in the Indian Territory, can have no application. But, on the other hand, the execution and recording of such leases is controlled by the laws of the state of Oklahoma; there being neither treaty provision nor act of Congress on the subject. Section 1195, Comp. Laws 1909, provides that actual notice to third persons shall be equivalent to the due acknowledgment and recording of any deed, mortgage, contract, bond, lease, or other instrument relating to real estate. In *Whit-*

*ham v. Lehmer,* 22 Okla. 627, 98 Pac. 351, we held that, where a tenant is in the actual possession of real estate at the time it is sold by the landlord, the purchaser is chargeable with notice of the rights of the tenant. Numerous authorities are there cited in support of this well-recognized principle.

The evidence showed that defendant was in possession of the lands in question at the time of the plaintiff's purchase. Manifestly this was under a former lease, as the lease excluded at the trial and through which defendant claimed the right of possession on January 2, 1910, being the date of the institution of the action, did not become effective until January 1, 1909. And as this question is not discussed in the briefs of either counsel, it is unnecessary to here give it further consideration, and we express no opinion as to the sufficiency of the notice, if such there was. If upon a new trial it should appear, however, that when plaintiff purchased the lands he had notice of the extent of the defendant's rights therein, according to the meaning of the statute, such notice would be equivalent to a proper recording of said lease, and be binding upon the purchaser.

We conclude, therefore, that the defendant in error was entitled to recover possession of the 40 acres originally constituting a part of the homestead of Louisa Harjoche, and that the deed of January 29, 1906, being superior in point of time, is superior in right to that of defendant's lease, as to the 40-acre homestead, and that as to the balance of the lands the judgment should be reversed, and a new trial granted plaintiff in error, and such further proceedings in the premises be had as may be consistent with this opinion.

By the Court: It is so ordered.