NUNN v. HAZELRIGG.

(Circuit Court of Appeals, Eighth Circuit.   July 8, 1914.)

No. 3968.

1. INDIANS (§ 5*)—TRIBAL CITIZENSHIP—CONCLUSIVENESS OF ROLLS MADE BY COMMISSION.

The decision of the Commission to the Five Civilized Tribes, under the authority given by Act June 10, 1896, c. 398, 29 Stat. 321, that a person was entitled to enrollment in the Creek Tribe either as a citizen or freedman, not appealed from, is conclusive of such right and also of his relationship to the tribe, whether by blood or as a freedman.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 5.*]

2. INDIANS (§ 15*)—CONVEYANCE BY ALLOTTEE—VALIDITY.

Under section 16 of the supplemental agreement with the Creek Nation, approved June 30, 1902, c. 1323, 32 Stat. 500, which provides that lands allotted to citizens shall not be incumbered nor alienated by the allottee or his heirs before the expiration of five years from the date when the agreement was approved, and that "any agreement or conveyance, of any kind or character, violative of any of the provisions of this paragraph, shall be absolutely void and not susceptible of ratification in any manner," a deed executed by a Creek allottee, enrolled as a citizen of Creek blood, after the five-year period but made in confirmation of one made before the expiration of that time, and without further consideration, is void, and will not support an action of ejectment.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 17, 29, 34, 37–44; Dec. Dig. § 15.*]

In Error to the District Court of the United States for the Eastern District of Oklahoma; Ralph E. Campbell, Judge.

Action at law by J. T. Hazelrigg against Charles J. Nunn.  Judgment for plaintiff, and defendant brings error.  Reversed.

E. J. Van Court, of Eufaula, Okl. (Van Court & Reubelt, of Eufaula, Okl., on the brief), for plaintiff in error.

Benjamin Martin, Jr., of Muskogee, Okl. (Villard Martin, of Muskogee, Okl., on the brief), for defendant in error.

Before SANBORN and SMITH, Circuit Judges, and POPE, District Judge.

SMITH, Circuit Judge.   This suit was brought in United States District Court for the Eastern District of Oklahoma in ejectment by the defendant in error, J. T. Hazelrigg, hereafter called the plaintiff, to recover an undivided one-half of approximately 108 acres of land, and against Charles J. Nunn, plaintiff in error, hereafter called the defendant.   The land in question is a part of the lands of the Creek Nation and constitutes the surplus allotment to one Tena Dan, now Cross.   She was enrolled by the commission of the Five Civilized Tribes, known as the Dawes Commission, as an eighth blood Creek Indian.   The petition was in a brief form, allowed by the laws of Oklahoma.

The answer alleges in substance:   That the land in question was patented to Tena Dan by the principal chief of the Muskogee, or Creek, Nation September 3, 1902, and the patent was approved by the Acting

Secretary of the Interior December 22, 1902. The land was conveyed April 22, 1904, by the said Tena Cross and husband by warranty deed to Mary A. Morrow, and on the 27th day of September, 1904, by the said Mary A. Morrow, a widow, by warranty deed to the defendant Charles J. Nunn. On November 4, 1907, said Tena Cross, under the name of Tena Dan, again conveyed said land by warranty deed to Thomas Haggard. On November 22, 1907, said Tena Cross, under that name, conveyed said land by warranty deed to Thomas Haggard to correct the error in the former deed. On November 5, 1907, Thomas Haggard and wife conveyed the land by warranty deed to Charles J. Nunn. The defendant alleges: That on the 27th day of September, 1904, he went into possession and occupancy of said lands under said deed from Mary A. Morrow, and that since said date his possession has been, and is now, exclusive, open, notorious, and adverse to all persons. That, at the time defendant purchased said land from the said Mary A. Morrow, he did so in good faith for the purpose of providing himself with a home, and paid, as a consideration for said deed, the full value of said land. That at said time the defendant knew the said Tena Cross, née Dan, and her parents, and knew that she and her said parents claimed to be negroes, and were in fact negroes, and had no knowledge that the said Tena Dan was enrolled as a "mixed blood Indian" on the rolls of the Creek Nation. That the defendant is informed and believes, and upon such information and belief avers and charges, that plaintiff claims to derive his alleged title to said land under the deed hereafter referred to.

"That immediately upon the public having access to the said Indian rolls, and it being ascertained that the said Tena Dan was falsely entered thereon as of mixed blood, plaintiff entered into a conspiracy with J. C. Ruby, G. R. Ruby, and Virgil R. Coss and others, all near relatives and business associates, to cheat and defraud defendant and cloud his said title. That, in furtherance of said conspiracy, the said G. R. Ruby well knowing the premises, and the fact that the said Tena Dan was enrolled as a mixed blood citizen, of the Creek Nation, on July 1, 1907, procured from the said Tena Dan, in the name of J. C. Ruby, a deed (Exhibit G) to said land, which said deed was taken for the use and benefit of said G. R. Ruby, and the same was procured by fraud and no consideration was paid therefor. That with the intention of validating said void deed, and in furtherance of said conspiracy, the said G. R. Ruby, without further consideration, on August 9, 1907, procured a deed (Exhibit H), from the said Tena Dan on said land. That on the 20th day of August, 1907, in furtherance of said conspiracy, and in order to further complicate and cloud defendant's title, the said G. R. Ruby and wife, without consideration, conveyed said land to the said Virgil R. Coss, which said deed is hereto attached, marked 'J,' and made a part of this answer. That on the 13th day of September, 1907, in furtherance of said conspiracy, and in order to further complicate and cloud defendant's title, the said Virgil R. Coss, without consideration conveyed an undivided one-half interest in said land to the said J. T. Hazelrigg, plaintiff herein, which said deed is hereto attached, marked Exhibit K, and made a part of this answer."

[1] The commission to the Five Civilized Tribes authorized by section 16 of the act of March 3, 1893 (27 Stats. 612, 645, c. 209), and the provision of the act of March 2, 1895 (28 Stats. 910, 939, c. 189), and commonly known as the Dawes Commission, was authorized and directed by the act of June 10, 1896 (29 Stats. 321, 339, c. 398), to:

"Proceed at once to hear and determine the application of all persons who may apply to them for citizenship in any of said nations, and after such hearing they shall determine the right of such applicant to be so admitted and enrolled. * * * In the performance of such duties, said commission shall have power and authority to administer oaths, to issue process for and compel the attendance of witnesses, and to send for persons and papers, and all depositions and affidavits and other evidence in any form whatsoever heretofore taken, where the witnesses giving said testimony are dead or now residing beyond the limits of said territory, and to use every fair and reasonable means within their reach for the purpose of determining the rights of persons claiming such citizenship, or to protect any of said nations from fraud or wrong, and the rolls so prepared by them shall be hereafter held and considered to be the true and correct rolls of persons entitled to the rights of citizenship in said several tribes: Provided, that if the tribe, or any person, be aggrieved with the decision of the tribal authorities or the commission provided for in this act, it or he may appeal from such decision to the United States District Court: Provided however, that the appeal shall be taken within sixty days, and the judgment of the court shall be final. That the said commission, after the expiration of six months, shall cause a complete roll of citizenship of each of said nations to be made up from their records, and add thereto the names of citizens whose right may be conferred under this act, and said rolls shall be, and are hereby, made rolls of citizenship of said nations or tribes, subject, however, to the determination of the United States courts, as provided herein. The commission is hereby required to file the lists of members as they finally approve them with the Commissioner of Indian Affairs to remain there for use as the final judgment of the duly constituted authorities. And said commission shall also make a roll of freedmen entitled to citizenship in said tribes and shall include their names in the lists of members to be filed with the Commissioner of Indian Affairs."

By the act of June 28, 1898 (30 Stats. 495, 503, c. 517), it is provided:

"The roll of Creek freedmen made by J. W. Dunn, under authority of the United States, prior to March fourteenth, eighteen hundred and sixty-seven, is hereby confirmed, and said commission is directed to enroll all persons now living whose names are found on said rolls, and all descendants born since the date of said roll to persons whose names are found thereon, with such other persons of African descent as may have been rightfully admitted by the lawful authorities of the Creek Nation. * * * Said commission shall make such rolls descriptive of the persons thereon, so that they may be * * * identified."

This makes it important to understand who were meant by Creek freedmen as used in this statute. African slavery existed among the Creeks before the Civil War. The Creeks made a treaty with the socalled Confederate States on July 10, 1861. The Emancipation Proclamation had, reference only to the states and parts of states, and did not under its terms extend to Indian Territory or to the slaves owned by Creeks.

On the 18th day of December, 1865, the adoption of the thirteenth amendment, abolishing slavery, was duly proclaimed; it provided:

"Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."

Until the act of March 3, 1871 (16 Stats. 544, 566, c. 120, R. S. 2079), the Indians were regarded as alien people residing in the United States. The Supreme Court has held that members of Indian tribes were not "born in the United States and subject to the jurisdic-

tion thereof," within the meaning of the fourteenth amendment of the Constitution. Elk v. Wilkins, 112 U. S. 94, 5 Sup. Ct. 41, 28 L. Ed. 643. To avoid any doubt as to whether the thirteenth amendment would be similarly construed, and for the purpose of securing the co-operation of the Creeks, the government made a treaty with them on June 14, 1866, article 2 of which provides:

"Article II. The Creeks hereby covenant and agree that henceforth neither slavery nor involuntary servitude, otherwise than in the punishment of crimes, whereof the parties shall have been duly convicted in accordance with laws applicable to all members of said tribe, shall ever exist in said nation; and inasmuch as there are among the Creeks many persons of African descent, who have no interest in the soil, it is stipulated that hereafter these persons lawfully residing in said Creek country under their laws and usages, or who have been thus residing in said country, and may return within one year from the ratification of this treaty, and their descendants and such others of the same race as may be permitted by the laws of the said nation to settle within the limits of the jurisdiction of the Creek Nation as citizens (thereof,) shall have and enjoy all the rights and privileges of native citizens, including an equal interest in the soil and national funds, and the laws of the said nation shall be equally binding upon and give equal protection to all such persons, and all others, of whatsoever race or color, who may be adopted as citizens or members of said tribe."

Out of the condition of slavery and subsequent action in relation thereto arose a considerable class of so-called Creek freedmen who were entitled to share in the allotment of Creek lands.

The Dawes Commission thus created and existing was a quasi judicial body. Kimberlin v. Commission of Five Civilized Tribes, 104 Fed. 653, 44 C. C. A. 109. It was expressly required to make separate rolls of the Indians and freedmen. To be enrolled as a Creek Indian, it was not sufficient for an applicant to show that he was an Indian, but he must show, and the commission must find, that he was an Indian of the Creek Tribe; and to be enrolled as a freedman it was not sufficient to show that he was an African, but he must show, and the commission must find, that he was a former slave or the descendant of a former slave of some member of the Creek Tribe, or at least a slave of some other person adopted by the Creek Nation. It was therefore necessary for an applicant for enrollment to show upon what grounds he was entitled to such enrollment; that he was of Creek Indian blood; that he was a Creek freedman, became a citizen of the tribe by the treaty of June 14, 1866; or that he had without any such rights become a member of the tribe by adoption. And, when the commission found by any one of these methods a person was entitled to enrollment, the manner in which he was found to be entitled to such enrollment was adjudicated as much as the mere fact of the right of enrollment. The cases are so numerous on this subject that it will be useless to stop to cite them. But the adjudication that Tena Dan was of Indian blood did not involve the question of her quantum of Indian blood; she was entitled to be enrolled if she was of Creek Indian blood; and the question whether she was a full-blood or one-eighth blood was not involved.

At the time of the deed from Tena Cross to Mrs. Morrow she was prohibited by law from alienating her surplus allotment. It is,

of course, manifest that if Tena Dan-Cross was not of Indian blood, and was not enrolled as of Indian blood, the deed made by her to Mrs. Morrow on April 22, 1904, was valid; but she had been adjudged by the Dawes Commission to be of Indian blood and so her deed was invalid.

Reference is made to the act of April 26, 1906 (section 19, c. 1876, 34 Stats. 137, 144), and to the act of May 27, 1908 (section 3, c. 199, 35 Stats. 312, 313). It must be remembered that those acts had to do with restrictions theretofore existing upon transfer by the Creek Indians, and proposed to base new restrictions upon the quantum of Indian blood, and it became material to provide that under those laws the rolls should be conclusive as to the quantum of such blood, but neither statute had anything to do with whether the rolls were an adjudication of the possession of Indian blood, as distinguished from the quantum of Indian blood.

[2] We therefore conclude that the sale to Mrs. Morrow and the subsequent sale to the defendant were invalid, and, for the reasons indicated, the case of Hegler v. Faulkner, 153 U. S. 109, 14 Sup. Ct. 779, 38 L. Ed. 653, cited by the defendant, is not in point. But the court sustained a special demurrer to the first, second, and third paragraphs of the answer. These included the portions of the answer we have literally quoted.

It will be remembered that it had been alleged in the answer that the defendant was and had been since the 27th day of September, 1904, in the exclusive, open, notorious, and adverse possession of the land in question. This being an action in ejectment, it was essential that if the plaintiff recover he should recover upon the strength of his own title, and not upon the weakness of the defendant's. It was alleged that, before the restrictions were removed, Tena Dan conveyed the land to J. C. Ruby, and that the deed of August 9, 1907, was given without consideration and with the intention of validating said void deed.

It is provided by section 16 of the act of June 30, 1902 (32 Stats. 500, 503):

"Lands allotted to citizens shall not in any manner whatever or at any time be incumbered, taken, or sold to secure or satisfy any debt or obligation nor be alienated by the allottee or his heirs before the expiration of five years from the date of the approval of this supplemental agreement, except with the approval of the Secretary of the Interior. * * * Any agreement or conveyance of any kind or character violative of any of the provisions of this paragraph shall be absolutely void and not susceptible of ratification in any manner, and no rule of estoppel shall ever prevent the assertion of its invalidity."

This act provides for its submission for ratification to the Creek Tribal Council, and this was the approval referred to in the section quoted. This approval was proclaimed on August 8, 1892 (32 Stats. 2021). Tiger v. Western Investment Co., 221 U. S. 286, 301, 31 Sup. Ct. 578, 55 L. Ed. 738.

In Alfrey v. Colbert, 168 Fed. 231, 234, 93 C. C. A. 517, it was said:

"We are of the opinion that it was the intention of Congress that no conveyance forbidden by any of the terms of the sixteenth section of the act should be susceptible of ratification or be made good by estoppel. The section in its completeness has a common subject-matter, the disposition of allotments, and the provisions regarding it would naturally be grouped or placed in a single subdivision or paragraph of an agreement or in a single section of a law. The express restrictions, upon alienation as to both homesteads and surplus lands appear in the first paragraph, not in the second, and it was to them the final clause was obviously directed. The act of June 30, 1902, differs from acts of Congress in general, in that the subdivisions thereof are not designated as sections. The body of the act was a prior agreement between the Dawes Commission and representatives of the Creek Tribe of Indians, and, with some changes, it was confirmed by Congress and submitted to the tribal council for ratification. The subdivisions or paragraphs of the prior agreement were consecutively numbered, and that arrangement was preserved when it was incorporated in the act. A similar arrangement and omission to designate numbered subdivisions or paragraphs as sections will be found in the agreement with the Choctaws and Chickasaws embodied in Act July 1, 1902, c. 1362, 32 Stat. 641. We think it quite clear that 'paragraph' was used synonymously with 'subdivision' or 'section,' and that it does not mean the minor undesignated part of the text, the arrangement of which may well be the mere result of taste, without intention to control the sense or import. The term 'paragraph,' in an act of Congress, will be construed to mean 'section,' whenever to do so accords with the legislative intent. Marine, Collector, v. Packham, 52 Fed. 579, 3 C. C. A. 210, 212."

We conclude that the court below erred in sustaining a demurrer to this portion of the answer. The pleadings did not show that the defendant had any title to the land in question, but if his allegation was true that the plaintiff's title was derived from a conveyance made prior to the time of the expiration of the period of restriction, and that the only other deed which he holds was given without consideration, and in ratification of the void deed, then it was void under the section of the act of 1902 quoted.

The result is that while the judgment is affirmed as to the conclusiveness of the judgment of the Dawes Commission, as to the question with reference to the defendant's ownership, the judgment is reversed, and the cause remanded, with a direction to set aside the judgment and verdict and this ruling on demurrer and award a new trial.