## LULA, SEMINOLE ROLL NO. 908, et al. v. POWELL.

No. 6600—Opinion Filed July 31, 1917.

(166 Pac. 1050.)

(Syllabus by the Court.)

1. **Indians—Lands—Restrictions on Alienation—Persons "Not of Indian Blood."**

Land was allotted to an adopted citizen of the Seminole Nation, enrolled as such on the roll of Seminoles by blood. The allottee was not by blood an Indian of any of the Five Civilized Tribes, but by blood a Caddo, or Wichita, Indian. The allottee died in 1905, and the land descended to her children. Held, notwithstanding the provision in section 19, Act Cong. April 26, 1906, c. 1876, 34 Stat. L. 137, that, "for all purposes the quantum of Indian blood * * * shall be determined by the Rolls of Citizens," such allottee and her children were not persons "who are not of Indian blood" within the meaning of Act of April 21, 1904, c. 1402, 33 Stat. L. 189. Held, further, that restrictions imposed by the Original Seminole Agreement (Act July 1, 1898, c. 542, 30 Stat. L. 567) upon alienation prior to date of patent were not removed by that act upon the portion of such allotment other than the homestead.

2. **Same—Alienation.**

If there be both adult and minor heirs, section 22, Act Cong. April 26, 1906, c. 1876, 34 Stat. L. 145, authorizes the alienation prior to date of patent and without approval of the Secretary of the Interior of the interests of a minor Indian heir of less than full blood in the portion of the allotment other than the

homestead, inherited from a deceased Indian allottee of the Seminole Nation, but only by joining in a sale with the adult heirs by guardian duly appointed upon order of court made upon petition filed by him. This section does not authorize an independent or separate sale of the interests of the minor. Therefore a sale of such interest prior to the passage of Act May 27, 1908, c. 199, by guardian, pursuant to orders of court in the exercise of general probate jurisdiction for the support, education, and maintenance of the minor, without joining with the adult heirs in a sale by them, does not pass the title of the minor.

### 3. Same.

Under Act Cong. March 3, 1903, c. 994, 32 Stat. L. 982, providing that the homestead "shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of the deed for the allotment," following Stout v. Simpson, 34 Okla. 129, 124 Pac. 754, death removes all restrictions imposed by the Original Seminole Agreement, 30 Stat. L. 567, upon the alienation of the tract of 40 acres designated as a homestead. Where the allottee died prior to the passage of the act of April 26, 1906, title passed to the heirs free of such restrictions without regard to the degree of Indian blood of the heirs or whether they were adults or minors; and prior to the passage of the act of April 26, 1906, the probate courts had jurisdiction to authorize and confirm a separate sale by guardian of such inherited interest of a minor in the homestead independent of a sale by the adult heirs, under procedure applicable to minors generally.

### 4. Same.

But subsequent to April 26, 1906, and prior to the passage of the act of May 27, 1908, it is held, upon authority of Brader v. James, 49 Okla. 734, 154 Pac. 560, that when there are both adult and minor heirs, a valid sale of such interest of the minor heir in the portion of the allotment designated as a homestead can only be made upon the condition and in the manner prescribed in section 22 of the act of April 26, 1906.

Hardy, Brett, and Rainey, JJ., dissenting.

Error from District Court, Seminole County; Tom D. McKeown, Judge.

Action by Lula, Seminole Roll No. 908, and another, by Alexander Crain, their guardian and next friend, against S. D. Powell. There was a judgment for the latter, and the former bring error. Affirmed in part, and reversed and remanded in part.

Frank H. Reed, for plaintiffs in error.

A. M. Fowler, for defendant in error.

MILEY, J. The land in controversy is that allotted, including the 40 acres designated as a homestead, to Annoche, an enrolled citizen of the Seminole Nation. According to the stipulation of the parties, Annoche was by blood a Caddo, or Wichita, Indian, and did not have any blood of any of the Five Civilized Tribes of Indians, but was an adopted citizen of the Seminole Nation, and enrolled as such on the approved Rolls of Citizens by blood. She died May 8, 1905, seised and possessed of an estate of inheritance in the land which descended to and vested in her children, Lula, Lizzie, and Ellen, also enrolled as adopted citizens of the Seminole Nation. They were necessarily of Indian blood through their mother, but of what degree does not appear from the record before us.

The defendant in error came into possession of the land in 1909, claiming title thereto. This action was commenced by Lula, a minor, and Lizzie, an incompetent person, by guardian and next friend, to recover of the defendant in error the interest in the land so inherited by them from the allottee, damages for withholding same, and to cancel the deeds under which he was claiming title thereto. Ellen was not a party to the action, and the title and right of the defendant in error to one-third interest in the land under conveyance from her was not in issue.

It was conceded at the trial that Lizzie was an incompetent person, and that the conveyance under which defendant in error claimed title to the interest inherited by her was void. The court below rendered judgment in favor of the plaintiff in error Lizzie for her interest in the land, and for damages for withholding same. The only complaint made of the judgment in so far as her interests are concerned is that the amount of the judgment for damages is on the evidence too small.

As to the interests of the plaintiff in error Lula, the court found in favor of the defendant in error. It appears that Lula is a minor. A guardian of her estate was appointed by the county court of Seminole county, and letters were issued to him December 31, 1907. The defendant in error claimed title under a deed of this guardian purporting to convey the interest of this minor in the entire allotment. The sale appears to have been authorized and confirmed by orders of county court, the court finding same was necessary for the purpose of maintaining, supporting, and educating said minor, and was for her best interest. The proceedings were had in the county court, the sale consummated and the deed executed and delivered prior to the passage of the act of May 27, 1908 (35 Stat. L. 312). The sale was not a joint sale with adult heirs of the allottee, but was an independent one of the interests of the minor alone. The convey-

ance was not approved by the Secretary of the Interior. The court below held that the interests of the minor in the entire allotment passed under this guardian's sale, and in this it is claimed that the court erred. The defendant in error has not favored us with a brief presenting his theory of the case.

In considering the question of the validity of the sale of the minor's interest, raised by proper assignments, and presented by counsel for plaintiff in error in a very able brief, it is necessary to separately treat of the sale as affecting the 40 acres designated as a homestead, and of the remainder of the allotment, which will be referred to as the surplus. We will first consider the surplus. The Original Seminole Agreement (30 Stat. L. 567), under which this land was allotted to Annoche, provides that:

"All contracts for sale, disposition, or incumbrance of any part of any allotment made prior to date of patent shall be void."

This constituted a restriction upon the alienation of any part of the allotment, which, of course, includes the surplus, prior to the date of patent. Under that provision a conveyance of the surplus executed before date of patent by an allottee during his lifetime, or by his heirs after his death, is void, unless the restriction was removed by some act of Congress. Goat v. U. S., 224 U. S. 458, 32 Sup. Ct. 544, 56 L. Ed. 841; Stout v. Simpson, 34 Okla. 129, 124 Pac. 754.

The patents or allotment deeds to this land not having been executed and delivered, the sale by the guardian was void unless prior thereto some act of Congress had been passed authorizing the same or removing the restriction. The first act passed affecting alienability of the portion of Seminole allotments other than the homestead is found in the act approved April 21, 1904 (33 Stat. L. 189), which provides:

"And all the restrictions upon the alienation of lands of all allottees of either of the Five Civilized Tribes of Indians who are not of Indian blood, except minors, are, except as to homesteads, hereby removed."

By section 19, Act Cong. April 26, 1906, 34 Stat. L. 137, it was enacted that:

"For all purposes the quantum of Indian blood possessed by any member of said tribes shall be determined by the Rolls of Citizens of said tribe approved by the Secretary of the Interior."

It may be contended that, inasmuch as the Rolls of Citizens of the Seminole Nation do not show the allottee and her heirs to be of Indian blood, that fact cannot be otherwise shown, and they are therefore persons "not of Indian blood" within the meaning of the provision of the act of April 21, 1904, supra. We do not think so. The effect of that act is to create an exception to the general restriction against alienation prior to date of patent imposed by the Original Agreement. Only those within the terms of the exception are relieved from the operation of the general restriction. Turning to the approved Rolls of Citizens to determine whether this allottee's surplus allotment is so excepted, we find nothing to indicate whether the allottee or her heir is of "Indian blood."

The term "adopted," while indicating that citizenship was not acquired by virtue of birth, does not necessarily establish the fact of no Indian blood. While persons of other races acquired tribal membership by adoption, those of the Indian race changed their allegiance and secured all the rights of membership in tribes other than that of their birth in the same way. And such is known to be true by those familiar with the history and customs of the Seminoles. Since the Rolls of Citizens do not determine the question of Indian blood, we think it permissible to do so otherwise. That was the conclusion reached by the Circuit Court of Appeals in United States v. Stigall, 226 Fed. 190, 141 C. C. A. 188. In that case, Munnah, a full-blood Creek, became a member of the Seminole Nation by adoption, and was so enrolled. On May 8, 1906, without the approval of the Secretary of the Interior, she executed a deed conveying part of her own allotment and that of her deceased son, who was enrolled as a one-half blood. This was before patents issued. The government commenced action to cancel conveyance because executed in violation of restrictions imposed by Congress. The question of the alienability of the land depended on the degree of Indian blood of Munnah. In passing on that question as affected by the acts to which we have referred, the court said:

"Separate rolls were made of the Seminoles by blood and the freedmen, but no separate rolls were made of the adopted citizens, but they were carried in the rolls of the Seminoles by blood. The freedmen were all of African descent, and their character is quite fully explained in Nunn v. Hazelrigg, 216 Fed. 330, 132 C. C. A. 474. The Indians, as a rule, never submitted to slavery. Therefore, if one were entered upon the freedmen's roll, it would appear he was not an Indian; but how about those entered upon the roll of Seminoles by blood as adopted? Every human being was capable of adoption by the tribe whether of the red race but of another tribe, the white, the black, the brown, or the yellow races. It is

almost a matter of common knowledge that some Indians, having ceased the nomadic life of their ancestors, found their relief from the tedium of the new domestic system in a change of tribes. It is conceded there were 20 persons on the Seminole Roll by adoption, but it does not appear whether they were Indians of other tribes or to what race they belonged. What, therefore, does the entry of a name on the Roll of Seminoles by blood of one as a member of the tribe by adoption indicate as to what race he belonged to? Absolutely nothing. The Dawes Commission, it is true, was a quasi judicial body, but the entry upon a Roll of the Seminoles by blood that a given person became a member of the tribe by being adopted was no more an adjudication that he is one of the white race than that he is an Indian. We conclude that the judicial body, the Dawes Commission, never made any adjudication as to whether Munnah was a white woman or an Indian."

The stipulation entered into by the parties at the trial says that the allottee "was an Indian by blood, but did not have any blood of any of the Five Civilized Tribes of Indians; she being by blood a Caddo, or Wichita, Indian." It may be urged that, not being of the blood of any of the Five Civilized Tribes, she was a person "not of Indian blood" within the meaning of the act of April 21, 1904, supra. While it is true that Congress was legislating for those tribes, we do not think the language used in designating the class upon which restrictions were thereby removed warrants a distinction being made between Indians by blood of some one of the Five Civilized Tribes and of some other Indian tribe, especially in view of the fact that Indians by blood of other tribes became citizens of those tribes by adoption or otherwise. Nor do we perceive any reason that such distinction was intended. By the several allotment acts and acts supplementary thereto, affecting these tribes, Congress imposed restrictions upon alienation without regard to the Indian blood or degree thereof of the allottees. By this act, Congress inaugurated a new policy, more fully developed under the later acts of April 26, 1906, and May 27, 1908, of removing or extending restrictions upon classes assumed to be more or less competent than others, according to the degree of Indian blood. As a class Indians by blood of the Five Civilized Tribes are certainly not less competent than those of other tribes. We therefore hold that this act did not operate to remove the restriction on the alienation of this surplus allotment by the allottee during her lifetime, or her heirs after her death; they being of Indian blood.

The only other act which it may be contended authorized the sale of the interest of this minor heir is that of April 26, 1906 (34 Stat. L. 137), which is as follows:

"That the adult heirs of any deceased Indian of either of the Five Civilized Tribes whose selection has been made, or to whom a deed or patent has been issued for his or her share of the land of the tribe to which he or she belongs or belonged, may sell and convey the lands inherited from such decedent; and if there be both adult and minor heirs of such decedent, then such minors may join in a sale of such lands by a guardian duly appointed by the proper United States court for the Indian Territory. And in case of the organization of a state or territory, then by a proper court of the county in which said minor or minors may reside or in which said real estate is situated, upon an order of such court made upon petition filed by guardian. All conveyances made under this provision by heirs who are full-blood Indians are to be subject to the approval of the Secretary of the Interior, under such rules and regulations as he may prescribe."

Under this section, the adult heirs of the allottee, if less than full-blood, were granted the unrestricted right to sell and convey the lands so inherited. If full-blood Indians, the conveyances of the heirs would not be effective unless approved by the Secretary of the Interior. But the conveyance of the interest of a minor heir, although less than a full-blood Indian, was not thereby authorized unless there were adult heirs also, and then only by joining in the sale with the adult heirs by guardian upon order of court. This is the limit of the power to sell. Such is the construction of the statute announced by this court in Wilson v. Morton, 29 Okla. 745, 119 Pac. 213, in which it was said:

"The act does not undertake to remove generally the restrictions upon alienation by minor heirs. It does authorize under certain conditions certain minor heirs to convey. * * * His authority to sell by his guardian is made dependent upon the existence of an adult heir, and, where there is an adult heir, authority is not given to the minor to sell alone and separately his interest, but he may, acting through his guardian, upon order of court, join the adult heir in a sale."

This, while perhaps dictum, states the views of this court, and we adopt the same, with this addition, however, that if the minor heir is a full-blood, under the last sentence of the section, the conveyance of his interest does not become effective unless approved by the Secretary of the Interior. The holding in this case does not, of course, have any bearing on sales by guardians under proper orders of the county court of the interest of minor heirs of deceased allottees had after the act of May 27, 1908, became effective.

In reference to the 40 acres of the allotment, which is ordinarily designated by the term "homestead," it is provided in the Original Seminole Agreement, supra, in addition to the provisions above quoted, as follows:

"Each allottee shall designate one tract of forty acres, which shall, by the terms of the deed, be made inalienable and nontaxable as a homestead in perpetuity."

This tract was designated by the allottee in her lifetime. By the act of Congress approved March 3, 1903 (32 Stat. L. 982), it was enacted:

"That the homestead referred to in said act (Original Seminole Agreement, 30 Stat. L. 567) shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of the deed for the allotment. A separate deed shall be issued for said homestead, and during the time the same is held by the allottee it shall not be liable for any debt contracted by the owner thereof."

This court in Stout v. Simpson, supra, held that under the provision just quoted, death operated to remove all restrictions on the homestead notwithstanding the provisions against alienation found in the Original Agreement, and that a deed executed by adult full-blood heirs of an allottee executed prior to the time of approval of the act of April 26, 1906, conveyed good title to the homestead. There is nothing in the Original or Supplemental Seminole Agreement, or any subsequent legislation pertaining to allottees thereunder prior to the act of April 26, 1906, imposing any restrictions upon the alienation by minors or minor heirs not also applicable to adults. Hence, following the reasoning in Stout v. Simpson, we must hold that upon the death of the allottee in 1905, the homestead passed to the heirs free of all restrictions, without regard to the degree of Indian blood or whether an adult or a minor. It would seem that it necessarily follows that a valid sale of such interest by a guardian could be had upon the authority, in the manner, and for the purposes, prescribed by general laws and applicable to minors generally. Having been accorded citizenship and subjected to the laws of the state and to the jurisdiction of the courts thereof, we see no reason, in the absence of an express provision to the contrary, why the unrestricted lands of an Indian minor were not subject to the jurisdiction of the probate courts to the same extent as the estate of any other minor. Such being the status of the homestead at the time of the passage of the act of April 26, 1906, it must be determined whether the alienation of the interest of the minor therein was affected by section 22 of that act. We were first of the opinion that it was not, but since considering the question further we have reached the contrary conclusion. This court held in Brader v. James, 49 Okla. 734, 154 Pac. 560, that although under section 12 of the Supplemental Choctaw-Chickasaw Treaty, relating to restrictions on the homestead, and which is substantially the same as the provisions of the act of March 3, 1903, relating to Seminole homesteads, the same passed upon the death of the allottee to his heirs free of all restrictions, under the last clause of section 22 of the act of April 26, 1906, a deed executed by a full-blood heir subsequent to the passage of that act and prior to the act of May 27, 1908, conveying the interest so inherited in such homestead, was void unless approved by the Secretary of the Interior. That decision has been frequently followed by this court. It necessarily follows that those provisions of the same section relating to the conveyance of the interest inherited by a minor heir of the allottee apply to interests which might previously have been otherwise alienated, as well as those which prior thereto were inalienable. Therefore the guardian's deed was void, and did not pass title to the interest of the plaintiff in error Lula in either the homestead or surplus portion of the allotment.

This disposes of the right to recover the land and to cancellation of the guardian's deed, and it is unnecessary to consider the assignments of error on the issue of fraud.

As to the complaint made of the judgment in favor of the plaintiff in error Lizzie, upon the amount awarded her as damages, we have examined the record and find that there is evidence reasonably supporting the finding of the trial court. That issue being one which might have been tried to a jury had either party so desired, the finding of the court is equivalent to the verdict of a jury, and under the well-settled rules of this court cannot be set aside on appeal if there is evidence reasonably tending to support same. There is no reason for disturbing the judgment as to the plaintiff in error Lizzie, and as to her the same will be affirmed, but as to the plaintiff in error Lula the judgment is reversed, and the cause remanded, with instructions to grant her a new trial and to proceed thereon as herein indicated.

All the Justices concur, except TURNER, J., absent, and HARDY, BRETT, and RAINEY, JJ., who dissent as to the proposition stated in fourth paragraph of the syllabus.